Filed 7/15/24  P. v. Frontuto CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B329796 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA030740) |
| v. | |
| SALVADOR FRONTUTO | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Alan K. Schneider, Judge.  Affirmed.

Emry J. Allen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Wyatt E. Bloomfield, Supervising Deputy Attorney General, and Christopher G. Sanchez, Deputies Attorney General, for Plaintiff and Respondent.

In 2000, a jury convicted defendant and appellant Salvador Frontuto and co-defendant Jesus Rodriguez of first degree murder (Pen. Code, § 187, subd. (a)) for the killing of Steve Alvarez.[1]  In April 2022, defendant filed a petition to vacate his murder conviction under former Penal Code section 1170.95 (now § 1172.6).  The trial court summarily denied the petition.

On appeal, defendant contends the trial court erred by denying his petition without issuing an order to show cause.  The People contend, and we agree, that defendant is ineligible for relief as a matter of law.  We affirm.

## BACKGROUND

### A.    Factual Background[2]

On June 14, 1998, Steve Alvarez and two-to-four other members of the Blythe Street Gang decided to "cruise around" to find people tagging in their territory, intending to jump them if they refused to stop.  The group drove around in two cars until finding a group of four men "hanging" outside of a building.  Several members of the group outside the building were from Crazy Mexican Life (CML), a "party crew" that included defendant and Rodriguez.[3]  The Blythe Street group parked their cars and approached the CML group.

---

[1]    Subsequent references to statutes are to the Penal Code.

[2]    The following summary is taken from our prior opinion resolving the direct appeal from judgment to provide context.

[3]    One witness testified that a party crew is a "group of people getting together to go out and have a good time."  The group also engaged in tagging, which involved writing their aliases on buildings.  At the time of the shooting, around 20 people were associated with CML.

As the Blythe Street group approached, members of the CML group asked where they were from and one person responded, "Blythe Street." Defendant and another person repeated the question and, receiving the same response, one member of the CML group (possibly defendant) shouted, "Fuck Blythe Street." Then, Rodriguez and defendant pulled out guns and started shooting at the Blythe Street group. Defendant's gun jammed after firing several shots.

Members of the Blythe Street group turned and ran away. Rodriguez and defendant ran behind Alvarez. Alvarez fell in bushes several houses down from the apartment. One of the men chasing Alvarez caught up, walked around, said, "Fuck Blythe Street," and fired around seven or eight shots at Alvarez. Law enforcement recovered eight spent bullet casings from the scene.

Defendant and several others were arrested a few days later. During his arrest, defendant told an officer a loaded .380 Lorcin handgun recovered from a car seat vacated by defendant was his. At trial, counsel stipulated a firearm expert examined the handgun and determined it had fired four expended cartridge cases collected at the scene.

A deputy medical examiner who performed Alvarez's autopsy determined the cause of death was multiple gunshot wounds. Of the eight gunshot wounds Alvarez suffered, five of them were fatal, meaning they were "located in a vital organ or extensive enough to produce death immediately." The examiner recovered five projectiles from Alvarez's body. Counsel stipulated a bullet recovered from a particular wound ("gunshot wound denominated number 2") came from the Lorcin handgun. The examiner testified this particular gunshot wound entered from the front of Alvarez's body causing a "fatal wound[ ]."

3

## B.    Procedural Background

Defendant and Rodriguez were tried together in May 2000. A jury convicted defendant of one count of first degree murder (§ 187, subd. (a)), found true the allegations he personally used a firearm during the commission of murder (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a)(1)), and that a principal personally and intentionally discharged a firearm (§ 12022, subd. (a)(1)). The trial court sentenced defendant to four years for the firearm enhancement allegations, ordered to be served before an indeterminate term of 25 years to life for first degree murder.

A panel of this court affirmed defendant's conviction. (*People v. Rodriguez & Frontuto* (June 21, 2002, B141976) [nonpub. opn.] (*Frontuto I*).) In the opinion, this court rejected various instructional and evidentiary errors and found sufficient evidence to sustain defendant's first degree murder conviction.[4] In so finding, this court rejected defendant's "continued insistence that there was no evidence that a bullet from his gun caused a fatal wound, and that the only bullet from his gun found in the victim was the bullet found in his leg. Again, [defendant] has misstated the evidence. Counsel stipulated that the bullet removed from the gunshot wound denominated number 2 came

---

[4]     Among the instructional errors alleged was from an erroneous reading on principles of aiding and abetting. This court noted the trial court's "misreading of its correct written instruction informed the jury that knowledge of unlawful purpose *or* intent was sufficient. The court said: 'A person aids and abets the commission of the crime when he or she, number one, with knowledge of the lawful purpose of the perpetrator; and number two, with the intent or purpose of encouraging or facilitating the purpose of the crime; or number three, by act or advice aids, promotes, encourages or instigates the commission of the crime.'" (*Frontuto I, supra*, at p. 21.)

4

from the Lorcin pistol. [The medical examiner] testified that bullet number 2 caused one of the fatal wounds. A bullet from [defendant's] gun therefore killed Alvarez, even though there may have been a concurrent cause." (*Frontuto I*, *supra*, at p. 40, citing *People v. Sanchez* (2001) 26 Cal.4th 834, 846–847; *People v. Pock* (1993) 19 Cal.App.4th 1263, 1276.)

In April 2022, defendant filed a form resentencing petition under section 1172.6, seeking resentencing on his murder conviction.[5] The trial court appointed counsel and received additional briefing. Following a prima facie hearing, the court summarily denied the petition, finding defendant ineligible for relief as a matter of law. Based on the jury instructions and verdict forms, the court reasoned defendant must have been convicted as an actual killer or direct aider and abettor who acted with an intent to kill. Defendant timely appealed.

## DISCUSSION

### A. Governing Law: Section 1172.6

Through Senate Bill No. 1437 (Stats. 2018, ch. 1015, § 1) (S.B. 1437), the Legislature clarified the felony murder rule and eliminated the natural and probable consequences doctrine to ensure any murder conviction and attached sentence is commensurate with individual culpability. (*People v. Gentile*

---

[5] In the form petition, defendant checked the boxes indicating he was convicted of murder following trial and that an information was filed against him allowing the prosecution to proceed under felony murder, the natural and probable consequences, or other theory under which malice is imputed based solely on the person's participation in a crime. Defendant did not check the box indicating he "could not presently be convicted of murder or attempted murder because of changes made to . . . §§ 188 and 189, effective January 1, 2019."

(2020) 10 Cal.5th 830, 842–843 (*Gentile*); *People v. Lewis* (2021) 11 Cal.5th 952, 957, 971 (*Lewis*); accord, § 189, subd. (e).) The Legislature also added former section 1170.95 (now section 1172.6), pursuant to which individuals convicted of felony murder or murder under the natural and probable consequences doctrine may petition for vacatur of their convictions and resentencing. (§ 1172.6, subd. (a).)

Within 60 days after service of a facially compliant petition, the prosecutor must file and serve a response, to which the petitioner may file and serve a reply. (§ 1172.6, subd. (c).) Following this briefing period, the court "shall hold a hearing to determine whether the petitioner has made a prima facie case for relief." (*Ibid.*) If the petition and record in the case establish conclusively that the petitioner is ineligible for relief as a matter of law, the trial court may summarily deny the petition. (See *People v. Strong* (2022) 13 Cal.5th 698, 708; *Lewis*, *supra*, 11 Cal.5th at pp. 970–972; § 1172.6, subd. (c).)

As relevant here, persons liable for murder under current law include actual killers and aiders and abettors who act with the intent to kill. (§ 189, subd. (e)(3).)

We review de novo whether the trial court properly denied a section 1172.6 petition without issuing an order to show cause. (*People v. Williams* (2022) 86 Cal.App.5th 1244, 1251.)

**B.** **Defendant Was Ineligible for Relief as a Matter of Law**

Defendant contends the trial court erred by summarily denying his petition because "the record does not conclusively show that [he] was convicted on a currently valid theory of

homicide." We disagree and conclude defendant was convicted of murder as an actual killer or direct aider and abettor.

To begin with, defendant acknowledges the jury never received instruction on theories of felony murder, the natural and probable consequences doctrine, or any target crime on which either theory could be based. (Accord, *People v. Cortes* (2022) 75 Cal.App.5th 198, 205 ["the jury was not instructed on any theory of liability . . . that required that malice be imputed to him"].) Because defendant "is not '[a] person convicted of felony murder or murder under a natural and probable consequences theory,' and he is therefore ineligible for relief as a matter of law." (*People v. Daniel* (2020) 57 Cal.App.5th 666, 677.)

Resisting this conclusion, defendant contends the jury could have convicted him under an uncategorized theory of imputed malice. Based on the record of conviction, we disagree and conclude defendant was convicted of first degree murder as an actual killer or direct aider and abettor.

The jury was instructed on the elements of murder (CALJIC No. 8.10), which required the prosecution to prove beyond a reasonable doubt that "1. A human being was killed; [¶] 2. The killing was unlawful; and [¶] 3. The killing was done with malice aforethought." CALJIC No. 8.11 defined express malice ("an intention unlawfully to kill"), while CALJIC No. 8.70 further instructed the jury to decide degree of murder, and CALJIC No. 8.74 required unanimity "as to whether he is guilty of murder of the first degree or murder of the second degree. . . ." In turn, CALJIC No. 8.20 defined first degree murder as any "murder which is perpetrated by any kind of willfull [*sic*], deliberate and premeditated killing with express malice aforethought. . . . [¶] . . . [¶] If you find that the killing was

7

preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, . . . it is murder of the first degree."

The jury also received instruction on the personal firearm use allegation (§ 1203.06(a)(1)) that "the defendants personally used a firearm during the commission" of murder. (CALJIC No. 17.19.) The instruction then provided that the "term 'personally used a firearm,' . . . means that the defendant must have intentionally displayed a firearm in a menacing manner, intentionally fired it, or intentionally struck or hit a human being with it. [¶] The People have the burden of proving the truth of this allegation. If you have a reasonable doubt that it is true, you must find it to be not true." (*Ibid.*) Regarding the term "defendant," the instructions clarified it "applies to *each* defendant unless you are instructed otherwise." (CALJIC No. 1.11, italics added.)

At trial, defendant stipulated "that one of the fatal bullets, number 2, came from a Lorcin pistol, and [he admitted] that the loaded Lorcin pistol found by arresting officers on the car seat that [he] had just vacated was his." (*Frontuto, supra,* at p. 22.) In turn, the instructions directed the jury to regard any stipulated fact "as proven as to the party or parties making the stipulation." (CALJIC No. 1.02.) As defendant acknowledges on appeal, this stipulated fact comprises part of the record of conviction on which the trial court can rely. (See *People v. Gaillard* (2024) 99 Cal.App.5th 1206, 1212; *Lewis, supra,* 11 Cal.5th at p. 970.)

Defendant contends these components of the record of conviction do not conclusively establish his liability for murder as the actual killer. He raises several arguments in support.

8

Defendant first argues that "[a]t most, the stipulation states that a shot fired by appellant [(defendant)] led to a series of events that ultimately resulted [i]n the death of the victim. It makes no mention of '*the*' shot that resulted in the death of the victim." Defendant misconstrues the effect of his stipulation. As this court previously noted, the bullet defendant concedes he fired caused a "fatal" wound, "meaning [it was] located in a vital organ or extensive enough to produce death immediately." (*Frontuto I, supra*, at p. 17.) Construed together, defendant's stipulation and the jury's personal use finding conclusively establishes defendant as an actual killer of Thomas.

Anticipating this result, defendant argues the personal use instructions "did not require the jury to make findings as to each individual defendant as opposed to the defendants (appellant and Rodriguez) considered collectively." While we agree a portion of CALJIC No. 17.19 referred to defendants in the collective, we do not agree this isolated language removed from the jury's consideration and finding that defendant himself used a firearm.

Beyond referencing the "defendants" collectively when introducing the enhancement allegation, CALJIC No. 17.19 defined the term "personally used a firearm" as *the defendant* having personally used a firearm in the commission of the offense. We presume the jury heeded the court's instruction not to isolate the prefatory plural language (see CALJIC No. 1.01 [directing jury not to "single out any particular sentence or any individual point or instruction and ignore the others"]). Moreover, the jury's verdict form verified its finding that "said defendant SAL FRONTUTO, personally used a firearm, within the meaning of Sections 1203.06(a)(1) and 12022.5(a)(1) to be true."

The foregoing components of the record of conviction demonstrate defendant's conviction as an actual killer as a matter of law.[6] This theory remains valid under current law. (See § 189, subd, (e)(3); *People v. Garcia* (2022) 82 Cal.App.5th 956, 970–971; *People v. Harden* (2022) 81 Cal.App.5th 45, 47, 56.)

We further conclude defendant's first degree murder conviction as a direct aider and abettor, the only alternative theory of liability on which his conviction was based, required his intent to kill. The instructions on direct aiding and abetting required (1) knowledge of the unlawful purpose of the perpetrator; (2) intent or purpose of committing or encouraging or facilitating the commission of murder; and (3) aiding, promoting, encouraging or instigating the commission of murder. (CALJIC No. 3.01.) In addition, the jury was instructed to consider each codefendant's guilt separately (CALJIC No. 17.00) and to find an intent to kill on the part of *defendant* individually (CALJIC Nos. 3.31, 3.31.5 [requiring "specific intent and mental state" for murder], 8.20 ["If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the *defendant* to kill, . . . it is murder of the first degree"], italics added).

"We 'credit jurors with the intelligence and common sense' [citation] and presume they generally underst[ood] and follow[ed] instructions." (*People v. McKinnon* (2011) 52 Cal.4th 610, 670.)

---

[6] As noted in *Frontuto I*, this theory of liability was fully consistent with Rodriguez's own conviction for the same offense. (See *Frontuto I, supra,* at p. 24 ["Frontuto and Rodriguez both shot the victim, and the wounds inflicted by either or both of them could have been the cause of death"]; *id.* at p. 40 ["A bullet from Frontuto's gun therefore killed Alvarez, even though there may have been a concurrent cause"]; see also CALJIC No. 3.41.)

Consistent with the law at the time defendant was convicted, the foregoing instructions required a finding defendant share the specific intent of the perpetrator to kill the victim. (See *People v. McCoy* (2001) 25 Cal.4th 1111, 1117–1118 [an accomplice ""share[d] the specific intent of the perpetrator" [by] "know[ing] the full extent of the perpetrator's criminal purpose and giv[ing] aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime""].)

*People v. Langi* (2022) 73 Cal.App.5th 972 (*Langi*), on which defendant relies, is inapposite. In that case, a jury convicted the defendant of second degree murder in connection with the beating death of a robbery victim. (*Id.* at p. 976.) The robbery victim fell and struck his head after someone in a group that included the defendant punched the victim "*directly in the face.*" (*Ibid.*, original italics.)

"As the case was tried, the jury could have found [Langi] guilty as an aider and abettor even if it found that someone else threw the fatal punch. The jury was not required to find, and did not necessarily find, that it was [Langi] who threw that punch. Read with the caution dictated by *Lewis*, the prior opinion [and jury instructions do] not conclusively establish that [Langi] was convicted as the actual killer." (*Langi, supra*, 73 Cal.App.5th at p. 980.)

Absent any finding by the jury that Langi was the actual killer, the *Langi* court reviewed jury instructions comprising part of Langi's record of conviction. (*Langi, supra*, 73 Cal.App.5th at pp. 980–981.) In its review, the court found Langi's conviction based on two instructions "of central significance" to its analysis: (1) a second degree murder instruction (CALJIC No. 8.31), and (2) general principles of aiding and abetting (CALJIC No. 3.01).

11

(*Id.* at p. 981.) As Langi's conviction was for second degree murder, the court found CALJIC No. 8.31 permitted a conviction insofar the perpetrator deliberately performed a fatal act, such as a punch, "with knowledge of the danger to, and with conscious disregard for, human life," and did not require finding the perpetrator's purpose was to kill the victim. (*Id.* at pp. 981–982.) For the jury to convict the defendant as an aider and abettor of second degree murder, it could have found Langi "need only have intended to encourage the perpetrator's intentional act—in this case, punching [the victim]—whether or not [Langi] intended to aid or encourage [the] killing, and whether or not he personally knew of and disregarded the risk of such a killing." (*Id.* at p. 983, fn. omitted.)

Unlike the defendant in *Langi*, defendant in this case was convicted of first degree murder as an actual killer or direct aider and abettor. As discussed, those theories required the jury to find defendant was the actual killer of Alvarez or aided and abetted his murder with knowledge of the actual killer's purpose and intent to unlawfully kill. The instructional ambiguities found in *Langi* do not exist in this case.

## C. No Violation of Constitutional Rights

Defendant contends he was denied the benefit of having an evidentiary hearing under section 1172.6, subdivision (d)(3), requiring the prosecution to prove his ineligibility for relief beyond a reasonable doubt. Defendant argues this violated his rights to due process, equal protection, and freedom from cruel and unusual punishment.

Defendant has forfeited these arguments for failing to develop them on appeal.  (See *People v. Guzman* (2019) 8 Cal.5th 673, 683, fn. 7.)

To the extent defendant articulates them, the arguments also fail on the merits.  As to equal protection, defendant does not specify any group to which he claims to belong.  Nor does he specify a group to which he claims to be similarly situated beyond "those found guilty of murder who make a *prima facie* showing of entitlement to relief."  Absent any connection or similarity to those who establish a prima facie entitlement for relief, defendant's equal protection claim fails.  (See *People v. Chatman* (2018) 4 Cal.5th 277, 288 [right to equal protection violated when the government treats similarly situated group of people unequally without "some justification"].)

Equally unavailing are defendant's procedural due process and Eighth Amendment claims.  Because defendant has not established a prima facie case for relief, he cannot claim to have a fair expectation the court would issue an order to show cause under section 1172.6.  In addition, defendant's prison sentence was based on his valid conviction for murder, not on any proceeding held under section 1172.6.  The trial court proceeded in a manner that was procedurally lawful and fair and issued a ruling that was substantively correct.  The outcome would be no different were we to remand the matter for further proceedings.  (See *People v. Jefferson* (2019) 38 Cal.App.5th 399, 409 ["remand is not appropriate when it would be an idle act"].)

13

## DISPOSITION

The order summarily denying defendant's petition for resentencing is affirmed.

MORI, J

We concur:

CURREY, P. J.

COLLINS, J.